**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

**Erin E. Kelly,**

**Plaintiff**

**-against-**

**Morpho Detection LLC and, as successor to Morpho Detection LLC, Smiths Detection Inc.**

**Complaint for Employment Discrimination and Retaliation**

Case No. 1:17-3003

**Jury Trial Demanded**

Plaintiff Erin E. Kelly ("Ms. Kelly" or the "Plaintiff"), by and through her undersigned counsel, Rita Costabile Tobin, RCTobinLaw, PLLC, as and for her Complaint in this action against Defendants Morpho Detection LLC ("Morpho Detection" or the "Defendant") and, as successor to Morpho Detection, Smiths Detection Inc. ("Smith Detection"; collectively, the "Defendants"), hereby alleges as follows:

## I. Nature of the Claims

1. This an action for equitable relief, lost wages and compensatory damages to redress Morpho Detection's unlawful employment practices and retaliation against the Plaintiff, including Morpho Detection's unlawful discrimination and harassment against the Plaintiff because of her gender; and retaliation against the Plaintiff after she had provided testimony regarding workplace gender discrimination while participating in a Morpho Detection Human Resources Department "Human Resources") investigation, initiated by another employee, regarding the actions of Plaintiff's supervisor, Will Hargett.

2. Ms. Kelly was employed full-time by Morpho Detection for approximately five and a half years, from August 11, 2010 through January 22, 2016, when she was discharged; prior to her full-

time employment, from 2008 until August 11, 2010 Ms. Kelly worked for Morpho Detection as an independent contractor.

3. Until Mr. Hargett became her supervisor, Ms. Kelly received favorable performance reviews.

4. In late 2015, Ms. Kelly provided testimony in a Morpho Detection internal investigation (the "Hargett Investigation") regarding the alleged conduct by Will Hargett.

5. Ms. Kelly's testimony included complaints that Mr. Hargett had treated her and other Morpho Detection women employees in a discriminatory manner.

6. As the result of the internal investigation, Mr. Hargett was reassigned; he has since left Morpho Detection.

7. As set forth below and in Ms. Kelly's EEOC charge and response to Morpho Detection's EEOC position paper, after testifying against Mr. Hargett, Ms. Kelly was subjected to unlawful retaliation and other discriminatory and harassing conduct, all designed to punish her for her testimony.

8. The goal of such retaliation, as evident from Morpho Detections actions and as disclosed to Ms. Kelly by a fellow employee who said that she was quoting a supervisor, was to "legally [sic] fire [Ms. Kelly]."

9. In furtherance of its illegal objectives, Morpho Detection removed Ms. Kelly from an important project, systematically stripped her of her duties and responsibilities, subjected her to a sham "restructuring" and, on January 22, 2016, discharged her.

10. Defendants' conduct was knowing, malicious and willful and showed a reckless disregard for Ms. Kelly, which has caused and continues to cause Ms. Kelly to suffer substantial economic damage and permanent harm to her professional and personal reputation.

## II. Parties to The Complaint

### A. The Plaintiff

11. Erin E. Kelly is a citizen of New York State. Her residence and contact information are as follows:

Ms. Erin Kelly
140 Riverside Boulevard, #1227
New York, NY 10069 (New York County)
(918) 742-0707
eekatlarge@gmail.com.

### B. The Defendants

12. Defendant Morpho Detection is headquartered in Newark, California. Defendant's contact information is as follows:

Morpho Detection LLC
7151 Gateway Boulevard
Newark, CA 94560
(Alameda County)
Telephone: (510) 739-2400
info@morphodetection.com.

13. Upon information and belief, pursuant to an agreement dated April 20, 2016 (the "Acquisition"), Morpho Detection LLC and Morpho Detection International LLC were to be acquired from their parent, Safran, S.A., a French multi-national company, by Smiths Group PLC, a London-based corporation with a U.S. subsidiary, Smiths Detection U.S., Inc., headquartered in Edgewood, MD, as follows:

Smiths Detection Inc.
2202 Lakeside Boulevard
Edgewood, MD 21040 (Harford County)
Telephone: (410) 612-2625
info@smithsdetection.com[1]

14. Upon information and belief, the Acquisition was consummated on April 10, 2017.

[1] Morpho Detection LLC's website has been replaced by the website of the successor firm, Smiths Detection U.S

C. **Place of Employment**

15. At all relevant times, Ms. Kelly worked from her home office, located in New York, NY.

III. **Jurisdiction and Venue**

16. This action is brought for discrimination in employment pursuant to Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17; New York State Human Rights Law, N.Y. Exec. Law §§ 290 to 297, and New York City Human Rights Law, N.Y. City Admin. Code §§ 8-101 to 131. The Court has supplemental jurisdiction over Plaintiff's related claims arising under state and local law pursuant to 28 U.S.C. § 1367(a).

17. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

IV. **Exhaustion of Federal Administrative Remedies**

18. By her attorney, Rita C. Tobin, Esq., the Plaintiff filed a Charge (the "Charge") against Morpho Detection with the Equal Employment Opportunity Commission (the "EEOC") regarding defendant Morpho Detection's alleged discriminatory and retaliatory conduct on May 12, 2016. A copy of the Charge is attached hereto as Exhibit 1.

19. On October 14, 2016, by its attorney, respondent Morpho Detection filed a position statement with the EEOC (the "Morpho Detection Position Statement") regarding the Charge. A copy of the Morpho Detection Position Statement is attached hereto as Exhibit 2.

20. On November 28, 2016, by her attorney, Ms. Kelly filed a reply (the "Kelly Reply") to the Morpho Detection Position Statement. A copy of the Kelly Reply is attached hereto as Exhibit 3.

21. On January 30, 2017, the EEOC issued a Notice of Right to Sue letter. A copy of the Notice of Right to Sue letter is attached hereto as Exhibit 4.

22. Ms. Kelly received the Notice of Right to Sue letter on February 2, 2017.

## V. Allegations of Fact

23. The allegations of fact in the Charge and Kelly Reply are incorporated herein by reference. (*See* Exhibits 1 and 3.)

24. On January 22, 2016 Erin Kelly was discharged from her position as Global Marketing Communications Manager for Morpho Detection, a firm for which she had worked beginning in 2008 as a contractor and since August 2010 as a full-time employee.

25. Ms. Kelly's termination culminated a two-year period of gender discrimination that began in May 2013, when Ms. Kelly returned from a maternity leave.

26. Ms. Kelly's termination occurred after over a year of retaliation, including subjection to a hostile working environment, that commenced after she had provided testimony regarding incidents of gender discrimination during the Hargett Investigation.

27. As a result of the Hargett Investigation, Mr. Hargett was demoted and reassigned; he has since left Morpho Detection's employ.

### A. Ms. Kelly's Participation in the Hargett Investigation

28. In December 2014, Ms. Kelly provided oral testimony in the Hargett Investigation to Morpho Detection Human Resources Manager Mark Hall.

29. On or about December 22, 2014, Ms. Kelly submitted to Human Resources an interview form (the "Kelly Interview Form") summarizing her oral testimony. A copy of the Kelly Interview Form is attached hereto as Exhibit 5.

30. As detailed below, the Kelly Interview Form included multiple allegations of gender discrimination against Mr. Hargett, who had become Ms. Kelly's supervisor after her former supervisor, Steven Hill, left the Company.

31. After Mr. Hargett was demoted and reassigned, he was replaced as Ms. Kelly's supervisor by Monty Lutzger, Mr. Hargett's former supervisor.

32. Mr. Lutzger remained Ms. Kelly's supervisor until her employment was terminated in January 2015.

## B. Violation of Confidentiality and Texts between Ms. Kelly and Shannon Marolt

33. A few weeks prior to her performance review on February 22, 2015 (the "February 15 Performance Review"; see discussion below), Ms. Kelly was told by colleagues that her confidential testimony in the Hargett Investigation had been inappropriately disclosed to certain Morpho Detection employees, including Mr. Hargett and other Marketing Department managers.

34. In a series of texts (the "Marolt Texts") sent on March 30 and 31, 2015, one of Ms. Kelly's Marketing Department colleagues, Shannon Marolt, confirmed to Ms. Kelly that senior Morpho Detection employees, including Mr. Hargett, knew who had testified against Mr. Hargett and were aware of what had been said. A transcript of the relevant portion of the Marolt Texts is attached hereto as Exhibit 6.

35. Specifically, Ms. Marolt disclosed that she had been contacted by a senior male colleague, Kevin Heffernan, who had demanded, "I need to know what you [*i.e.*, Ms. Marolt] had to do with getting Will almost fired." (*See* Exhibit 6.)

36. Ms. Marolt further stated that Mr. Heffernan had disclosed to Ms. Marolt that the "thinking" was that Morpho Detection would "go the legally correct route and rewrite our job descriptions and then MD [the Company] wouldn't have a lawsuit on its hands." (*See id.*)

37. Ms. Marolt reported that Mr. Heffernan had further stated that Mr. Hargett was "blaming the women in his department" for his demotion and reassignment. (*See id.*)

38. The statements reported in the Marolt Texts, made by Mr. Heffernan and other Morpho Detection supervisors, including Monty Lutzger, Ms. Kelly's new supervisor, caused Ms. Kelly to reasonably believe that Morpho Detection intended to retaliate -- to "clean house" as Ms. Marolt put it -- of certain women employees who had testified against Mr. Hargett.

## C. Acts of Gender Discrimination and Retaliation Described by Ms. Kelly during the Hargett Investigation

39. In the Kelly Interview Form, Ms. Kelly provides specific details regarding acts of alleged gender discrimination by Mr. Hargett. *See* Exhibit 5.

40. The specific acts of alleged illegal discrimination reported by Ms. Kelly included but were not limited to the following actions by Mr. Hargett:

a. Responding to a question regarding her assessment of Mr. Hargett as a leader, Ms. Kelly states:

"[Hargett's] approach varies widely from team member to team member, **and obviously favors the males on the team, who are widely perceived as not producing much in the way of deliverables, and/or produce poor-quality work and yet are provided with repeated opportunities for advancement and executive exposure while the performance of the majority of the women on the team is unwarrantedly called into question. The two youngest females on the team, Shannon and Ms. Kelly, have in fact experienced de facto demotions**; following her return from maternity leave, Shannon was moved under Pam, and Ms. Kelly's direct report, Steve, was removed and essentially elevated which Ms. Kelly knows was discussed as a demotion." (*See* Exhibit 5, p. 5.; *emphasis added.*)

"Will typically does not directly assign the work Ms. Kelly does, as her projects are the result of needs identified by sales, by Ms. Kelly, or by other functions of the business. Increasingly, when projects of the sort Ms. Kelly is responsible for come to him first, he has assigned work to others without making Ms. Kelly aware of it, or begun work himself without mentioning it." Ms. Kelly further states that she noticed this change behavior after returning from maternity leave in May of 2013; before that, she states, Ms. Kelly was entrusted to manage her own work and assign resources as she saw fit. (*See* id., p. 6.)

b. Responding to a question regarding Mr. Hargett's interactions with the team, Ms. Kelly states:

"The team is very obviously divided into two groups in numerous ways. One way of looking at the two sides is high-output performers/under or non-performers; another way is female/male. **A friend of mine noted that it sounds like the team is comprised of people who work and people who talk, and that those two groups just happen to include either all of the females (the workers) or all of the males (the talkers.)"** (*See id.*, p. 7; *emphasis added.*)

c. Asked about additional incidents of gender discrimination, Ms. Kelly states that there "appears to be a very clear pattern of discrimination or bias based on gender," the outlines of which became apparent following her return from maternity leave in May of 2013. (*See id.*, p. 8; *emphasis added.*)

[Numerous specific references to preferential treatment; including denying Ms. Kelly access to opportunities to advance; *See id.*, p. 10 *et seq.*]

**D. <u>Discrimination and Retaliation: Subsequent Adverse Actions</u>**

41. As described below, acts of illegal discrimination and retaliation by both Mr. Hargett and the other Morpho Detection managers to whom Ms. Kelly reported, dogged her after her testimony in the Hargett Investigation.

**a. The February 2015 Performance Review – By Mr. Hargett**

42. Prior to working for Mr. Hargett, Ms. Kelly had earned excellent performance reviews. A copy of a 2011 performance review by Steven Hill, her former supervisor is attached hereto as Exhibit 7.

43. **Despite Morpho Detection's knowledge of Ms. Kelly's allegations of gender discrimination against Mr. Hargett, on February 24, 2015 Morpho Detection permitted Mr. Hargett to create and deliver Ms. Kelly's annual performance review – the February 2015 Performance Review -- evaluating her performance in the year 2014.**

44. Moreover, Mr. Hargett expanded the scope of the February 2015 Performance Review to include work that Ms. Kelly had performed in January 2015 and February 2015.

45. To include January 2015 and February 2015 in the February 2015 Performance Review was a violation of Morpho Detection policy.

46. The February 2015 Performance Review was significantly worse than any that Ms. Kelly had previously received, evidencing Mr. Hargett's and Morpho Detection's retaliatory animus against Ms. Kelly.

47. Believing that the February 2015 Performance Review was both discriminatory and retaliatory, on February 24, 2015 Ms. Kelly voiced her complaints in an e-mail to Human Resources Manager Mark Hall. (Ms. Kelly's e-mail to Mark Hall is attached hereto as Exhibit 8.)

48. After sending the e-mail, Ms. Kelly further her complaints about discrimination and retaliation call in a follow-up telephone call to Mr. Hall.

**b. Evisceration of Ms. Kelly's Responsibilities**

49. After Ms. Kelly testified in the Hargett Investigation, her duties and responsibilities were systematically eviscerated.

50. Attached to hereto as Exhibit 9 is a one-page "internal resume," outlining Ms. Kelly's role and responsibilities.

51. The one-page internal resume was created by Morpho Detection for the new chief executive officer when she first joined the Company, so that the CEO would know who Morpho Detection's employees were and those employee's respective responsibilities.

52. Ms. Kelly has crossed out each responsibility that was taken from her between January 2015 and January 22, 2016, when she was terminated.

53. As is evident in Exhibit 9, Ms. Kelly's responsibilities were taken away from her – i.e., her job was effectively eviscerated – after testified against Mr. Hargett. (*See* Exhibit 9.)

54. In addition, on May 22, 2015, in a further act of illegal retaliation, Ms. Kelly was dropped without good cause from a major project, the TransformMD ERP implementation.

**c. Confidentiality Breaches and Displays of Retaliatory Animus by Morpho Detection Manager**

55. Although Ms. Kelly had been promised confidentiality regarding her testimony at during the Hargett Investigation, upon information and belief, her confidentiality was repeatedly breached.

56. Such breaches of confidentiality were acts of retaliation against Ms. Kelly and provide further evidence of the retaliatory, toxic working environment to which she was subjected after testifying in the Hargett Investigation.

57. As described above, Ms. Kelly learned from other Morpho Detection employees prior to the February 2015 Performance Review that, despite the assurances of confidentiality provided to her by Morpho Detection Human Resources during the Hargett Investigation, senior employees in the Marketing Department had become aware of the substance of her testimony, including her allegations of gender bias.

58. In addition, upon information and belief, during a February 11, 2015 Global Sales Meeting led by Mr. Lutzger (the "February Global Sales Meeting"), James Bergen, the Director of International Marketing, a close friend of Will Hargett whom Mr. Hargett had hired, repeated confidential statements made by Ms. Kelly during the Hargett Investigation, asking the other meeting attendees, "What is Erin Kelly's game?"

59. Upon information and belief, Mr. Bergen went on to suggest that "it's me [i.e., Mr. Bergen], she's been trying to get all long," speculating whether Ms. Kelly had "hired a lawyer."

60. Upon information and belief, Mr. Bergen went on to suggest that Ms. Kelly was treating the Hargett Investigation "as a meal ticket" so that she could "stay home with the kids."

61. Upon information and belief, Mr. Bergen repeated specific information provided by Ms. Kelly to Human Resources during the Hargett Investigation, citing the precise number of pages in the Kelly Interview Form.

62. The February Global Sales Meeting took place less than a week before Ms. Kelly received the February 2015 Performance Review.

E. **Payback: The Alleged Restructuring**

63. On August 25, 2015, Morpho Detection's Chief Marketing Technologist, Sara Bresee, announced a restructuring of the Marketing Department.

64. Although Morpho Detection claims in the Morpho Detection Position Statement that the alleged restructuring of the Marketing Department was part of a "company-wide" restructuring, upon information and belief, there was no such company-wide restructuring.

65. Instead, the alleged restructuring affected only one Morpho Detection department – namely, the Marketing Department, in which Ms. Kelly was employed.

66. Moreover, Ms. Bresee disclosed that only two of the Marketing Department's six employees would be affected by the alleged restructuring.

67. One of the two affected employees was Ms. Kelly, who was notified by Ms. Bresee in August 2015 that she would have to reapply for her job.

68. Given the warning that she had received from Ms. Marolt; breach of her confidentiality, evisceration of her duties and responsibilities; and additional acts of discrimination and retaliation that she had experienced, Ms. Kelly sincerely believed, and continues to believe, that rather than carrying out a good faith reorganization of the Marketing Department, Morpho Detection was attempting to create a pretext for what it would later claim was "legal" termination of her employment.

69. Nonetheless, Ms. Kelly interviewed for a Marketing Department position on the 9th, 18th, 21st and 25th of September 2015.

70. Ms. Kelly's colleague – the second of the two employees to be affected by the alleged restructuring -- was invited back for additional interviews and hired for a new position that, upon information and belief, was in essence identical to his former position.

71. Ms. Kelly was not offered a new position at Morpho Detection.

72. Upon information and belief, all but one of the four Morpho Detection employees who interviewed Ms. Kelly reported directly to Mr. Lutzger – *i.e.* were his subordinates, over whom he had authority -- while the fourth interviewer had previously reported to him.

73. Upon information and belief, not one independent, objective interviewer considered Ms. Kelly's application.

74. The interviewers' evaluations of Ms. Kelly – who at the time that she was interviewed, had been successfully employed or working as a contractor for Morpho Detection for over 7 years – were harshly critical and greatly detailed.

75. In contrast, the evaluations of Ms. Kelly's competitor were perfunctory and highly laudatory.

76. Ms. Kelly sincerely believes that the written evaluations of her interviews were pretexts, prepared in anticipation of litigation by employees acting as dutiful agents of the same managers who, only months before, had expressed their intention to "legally [sic] fire her."

77. *Upon information and belief, Ms. Kelly was the sole employee to be terminated as the result of the alleged Morpho Detection Marketing Department alleged restructuring.*

**F. Termination of Employment**

78. On January 7, 2016, Morpho Detection's counsel notified Ms. Kelly's counsel, Rita Costabile Tobin, Esq., that Ms. Kelly would not be rehired.

79. Morpho Detection's counsel further told Ms. Kelly's counsel that Ms. Kelly could either accept an offer of six-week's severance pay, or work on an alleged final project for the next ten weeks, after which she would be discharged.

80. Morpho Detection's counsel further asserted that Ms. Kelly would be permitted to seek an alternative position at Morpho Detection before her discharge.

81. No such alternative position, however, was ever specified or offered my Morpho Detection to Ms. Kelly.

82. Nor was any position suitable for an applicant with Ms. Kelly's background and skills listed as available by Morpho Detection Human Resources during the relevant period.

83. Renewing her allegations of discrimination and retaliation, Ms. Kelly rejected Morpho Detection's severance alternatives.

84. Nonetheless, Ms. Kelly continued each day to download and review a list of the allegedly open positions at Morpho Detection – none of which matched her skills and experience.

85. In addition, Ms. Kelly made herself available each day for work and completed any work that she was given.

86. On January 16, 2016, Ms. Kelly's attorney received notice from the Company that her employment was terminated as of that date.

**G. <u>Ms. Kelly's Responses to Morpho Detection</u>**

**1. <u>Initial Complaint to Morpho Detection Human Resources</u>**

87. On July 13, 2015 (the "July 13 Complaint"), Ms. Kelly wrote to Morpho Detection's Vice President of Human Resources, Ms. Tracy Sendrick.

88. In the July 13 Complaint, Ms. Kelly alleged that she was being retaliated against due to her participation in the Hargett Investigation and specified certain actions allegedly taken against her by Morpho Detection, including the evisceration of her workload and responsibilities, that Ms. Kelly, alleged were retaliatory. A copy of the July 13 Complaint is attached hereto as Exhibit 10.

89. On August 25, 2015, a few hours after Ms. Kelly had been informed by Ms. Bresee that the Marketing Department was being restructured, Ms. Sendrick contacted Ms. Kelly by e-mail to set up a telephonic conference to review the Complaint.

90. In a telephonic conference on September 2, 2017, Ms. Sendrick stated to Ms. Kelly that Morpho Detection had conducted an internal investigation of the July 13 Complaint and found it to be without basis.

91. Shortly after their telephonic conference, Ms. Kelly received a letter from Ms. Sendrick, dated August 19, 2015 – that is, dated two weeks prior to their telephonic conference – in which Ms. Sendrick stated that Morpho Detection had investigated and rejected the allegations in the July 13 Complaint. A copy of Ms. Sendrick's letter to Ms. Kelly is attached hereto as Exhibit 11.

91. Prior to Ms. Sendrick's response, no Morpho Detection representative had either discussed the July 13 Complaint with Ms. Kelly; asked her to provide evidence to support her allegations; or otherwise communicated with Ms. Kelly regarding the July 13 Complaint.

93. In a written reply sent on September 4, 2015, Ms. Kelly informed Ms. Sendrick that she rejected the results of the alleged internal investigation, noting that she, the complaining party, had not been interviewed as part of that alleged investigation. A copy of Ms. Kelly's reply to Ms. Sendrick is attached hereto as Exhibit 12.

2. **The Moore Investigation**

94. In September 2015, Morpho Detection hired Julie Moore, Esq. to investigate Ms. Kelly's complaints of discrimination and retaliation (the "Moore Investigation").

95. Ms. Kelly cooperated fully in the Moore Investigation, meeting with Ms. Moore in person and participating in several telephone interviews.

96. In late December 2015, Ms. Kelly's attorney was sent a summary, dated December 18, 2015, of the Moore Investigation's findings (the "Summary"). A copy of the Summary is attached to the hereto as Exhibit 13; Morpho Detection has declined Ms. Kelly's counsel's requests to provide Ms. Kelly with a copy of the full report.

97. According to the Summary, the Moore Investigation concluded that Ms. Kelly's complaints of discrimination and retaliation were unfounded.

98. The Summary suggested, however, that the Moore Investigation or Moore Report:

(1) Failed to include interviews by Ms. Moore with any of the employees whom Ms. Kelly had told her would corroborate her Complaint; yet did include interviews with all those with a motive to falsify, including but not limited to Mr. Hargett, Mr. Lutzger, and Ms. Bresee, the Chief Marketing Technologist, who worked for Mr. Lutzger.

(2) Credited misstatements of significant facts and contained important omissions regarding Ms. Kelly's testimony in the Hargett Investigation (did not mention, for example, that Ms. Kelly had complained of sex discrimination);

(3) Overstated extent of the alleged company restructuring. In fact, that restructuring had included only Ms. Kelly's own department, and, the only person terminated was Ms. Kelly;

(4) Omitted history, which Ms. Kelly had shared with Ms. Moore, regarding prior allegations of retaliation, relevant to his credibility, that had been made against Mr. Lutzger, her current supervisor;

(5) Did not follow up on other evidence that Ms. Kelly had provided to Ms. Moore to rebut Morpho Detection's false contentions regarding her performance, including an e-mail, mysteriously disappeared from Ms. Bresee's files but retained by Ms. Kelly, that disproved a false allegation that Ms. Kelly had not provided notice of a sick day to Ms. Bresee.

99. These as well as other misstatements or omissions led Ms. Kelly to conclude that the Moore Report was inaccurate and unreliable.

**FIRST CAUSE OF ACTION**

**DISCRIMINATION AND HARASSMENT IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000e**

100. Plaintiff hereby repeats and realleges each and every allegation in paragraphs 1 through 99, inclusive, as if fully set forth herein.

101. Defendants have discriminated against Plaintiff on the basis of her gender in violation of Title VII, by denying her the same terms and conditions employment available to employees who are not women, including but not limited to subjecting her to disparate working conditions and denying him the opportunity to work in an employment setting free of unlawful harassment.

102. Defendants have discriminated against Plaintiff on the basis of her gender in violation of Title VII by creating, fostering, accepting ratifying and/or otherwise failing to prevent or remedy a hostile

environment that included, among other things, severe and pervasive harassment of plaintiff because of her gender, including breaches of her confidentiality and belittling comments, including those targeting and stereotyping her role as a mother of small children.

103. Defendants' conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Ms. Kelly, entitling her to punitive damages.

104. As the direct, proximate, pretextual result of Defendants' conduct alleged in this Complaint, Ms. Kelly has suffered and continues to suffer harm, including but not limited to lost earnings, lost benefits and other financial losses, as well as damages to her professional and personal reputation.

105. By reason of Defendants' discrimination, the Plaintiff is entitled to all legal and equitable remedies available for violations of Title VII, including an award of punitive damages.

106. Attorneys' fees should be awarded under 42 U.S.C. § 2000e.

**SECOND CAUSE OF ACTION**

**RETALIATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000e**

107. Plaintiff hereby repeats and realleges each and every allegation in paragraphs 1 through 106, inclusive, as if fully set forth herein.

108. Ms. Kelly engaged in protected activity by participating in the Hargett Investigation and testifying that Mr. Hargett had engaged in illegal gender discrimination.

109. Defendants' engaged in adverse employment actions against Ms. Kelly for engaging in protected activity.

110. Such adverse actions included but were not limited to subjecting Ms. Kelly to unfavorable terms and conditions of employment, including, *inter alia*, a negative performance review, delivered by the supervisor against whom she had testified; a hostile working environment; effective demotion and evisceration of her responsibilities; and wrongful termination.

111. A reasonable employee would find Defendants' retaliatory acts materially adverse and such acts would dissuade a reasonable person from making or supporting a charge of discrimination.

112. Defendants' retaliatory acts against Ms. Kelly were a direct, proximate and pretextual result of the plaintiff's protected activities.

113. Defendants' conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Ms. Kelly, entitling her to punitive damages.

114. As the result of Defendants' conduct alleged in this Complaint, Ms. Kelly has suffered and continues to suffer harm, including but not limited to lost earnings, lost benefits and other financial losses, as well as damages to her professional and personal reputation.

115. By reason of Defendants' discrimination, Ms. Kelly is entitled to all legal and equitable remedies available for violations of Title VII, including an award of punitive damages.

116. Attorneys' fees should be awarded under 42 U.S.C. § 2000e.

## THIRD CAUSE OF ACTION

### DISCRIMINATION AND HARASSMENT IN VIOLATION OF THE NYSHRL

117. Plaintiff hereby repeats and realleges each and every allegation in paragraphs 1 through 116, inclusive, as if fully set forth herein.

118. Defendants have discriminated against Plaintiff on the basis of her gender in violation of the NYSHRL by denying her the same terms and conditions employment available to employees who are not women, including but not limited to subjecting her to disparate working conditions and denying him the opportunity to work in an employment setting free of unlawful harassment.

119. As the direct, proximate, pretextual result of Defendants' conduct alleged in this Complaint, Ms. Kelly has suffered and continues to suffer harm, including but not limited to lost earnings, lost benefits and other financial losses, as well as damages to her professional and personal reputation.

120. By reason of Defendants' discrimination, Ms. Kelly entitled to all legal and equitable remedies available for violations of the NYSHRL

**FOURTH CAUSE OF ACTION**

**RETALIATION IN VIOLATION OF THE NYSHRL**

121. Plaintiff hereby repeats and realleges each and every allegation in paragraphs 1 through 120, inclusive, as if fully set forth herein.

122. Ms. Kelly engaged in protected activity by participating in the Hargett Investigation and testifying that Mr. Hargett had engaged in illegal gender discrimination.

123. Defendants engaged in adverse employment actions against Ms. Kelly for engaging in protected activity.

124. Such adverse actions included but were not limited to subjecting Ms. Kelly to unfavorable terms and conditions of employment, including, *inter alia*, a negative performance review, delivered by the supervisor against whom she had testified; a hostile working environment; effective demotion and evisceration of her responsibilities; and wrongful termination.

125. A reasonable employee would find Defendants' retaliatory acts materially adverse and such acts would dissuade a reasonable person from making or supporting a charge of discrimination.

126. Defendants' retaliatory acts against Ms. Kelly were a direct, proximate and pretextual result of the plaintiff's protected activities.

127. As the result of Defendants' conduct alleged in this Complaint, Ms. Kelly has suffered and continues to suffer harm, including but not limited to lost earnings, lost benefits and other financial losses, as well as damages to her professional and personal reputation.

128. By reason of Defendants' retaliation, Ms. Kelly is entitled to all legal and equitable remedies available for violations of the NYSHRL.

**FIFTH CAUSE OF ACTION**

**DISCRIMINATION AND HARASSMENT IN VIOLATION OF THE NYCHRL**

129. Plaintiff hereby repeats and realleges each and every allegation in paragraphs 1 through 128, inclusive, as if fully set forth herein.

130. Defendants have discriminated against Plaintiff on the basis of her gender in violation of the NYSHRL by denying her the same terms and conditions employment available to employees who are not women, including but not limited to subjecting her to disparate working conditions and denying him the opportunity to work in an employment setting free of unlawful harassment.

131. As the direct, proximate, pretextual result of Defendants' conduct alleged in this Complaint, Ms. Kelly has suffered and continues to suffer harm, including but not limited to lost earnings, lost benefits and other financial losses, as well as damages to her professional and personal reputation.

132. By reason of Defendants' discrimination, Ms. Kelly entitled to all legal and equitable remedies available for violations of the NYCHRL

**SIXTH CAUSE OF ACTION**

**RETALIATION IN VIOLATION OF THE NYCHRL**

133. Plaintiff hereby repeats and realleges each and every allegation in paragraphs 1 through 132, inclusive, as if fully set forth herein.

134. Ms. Kelly engaged in protected activity by participating in the Hargett Investigation and testifying that Mr. Hargett had engaged in illegal gender discrimination.

135. Defendants engaged in adverse employment actions against Ms. Kelly for engaging in protected activity.

136. Such adverse actions included but were not limited to subjecting Ms. Kelly to unfavorable terms and conditions of employment, including, *inter alia*, a negative performance review,

delivered by the supervisor against whom she had testified; a hostile working environment; effective demotion and evisceration of her responsibilities; and wrongful termination.

137. A reasonable employee would find Defendants' retaliatory acts materially adverse and such acts would dissuade a reasonable person from making or supporting a charge of discrimination.

138. Defendants' retaliatory acts against Ms. Kelly were a direct, proximate and pretextual result of the plaintiff's protected activities.

139. As the result of Defendants' conduct alleged in this Complaint, Ms. Kelly has suffered and continues to suffer harm, including but not limited to lost earnings, lost benefits and other financial losses, as well as damages to her professional and personal reputation.

140. By reason of Defendants' retaliation, Ms. Kelly is entitled to all legal and equitable remedies available for violations of the NYCHRL.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays that the Court enter judgment in her favor and against Defendants, containing the following relief:

a. A declaratory judgment that the action conduct and practices of the Defendants complained of herein violate the laws of the United States and the State and City of New York;

b. An order directing Defendants to place Plaintiff in the position that she would have occupied but for the Defendants discriminatory and harassing treatment, retaliation and otherwise unlawful conduct, as well as to take such affirmative action is necessary to ensure that the effects of these unlawful employment practices are eliminated and do not continue to affect her employment;

c. An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic harm;

d. An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for harm to her professional personal reputation and loss of career fulfillment;

e. An award of damages for any and all other monetary and. or non-monetary kisses suffered by plaintiff in an amount to be determined at trial, plus prejudgment interest;

f. An award of punitive damages

g. An award of costs that plaintiff has incurred in this action, as well as plaintiff's reasonable attorneys' fees to the fullest extent permitted by law;

And such other and further relief as the court may deem must just and proper.

**JURY DEMAND**

Plaintiff hereby demands trial by jury on all issues of fact and damages stated herein.

**FEDERAL RULE OF CIVIL PROCEDURE 11**

By signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

April 25, 2017

**RCTOBINLAW, PLLC**

By: ______________________
Rita Costabile Tobin (RC-6513)
N.Y.S. Bar No. 2412179

41 Cowdin Circle
Chappaqua, NY 10514-1804
Telephone: (917) 680-3159
Facsimile: (917) 720-9767
rita.tobin@rctobinlaw.net